20047

Herbert J. ALMERS, Jr., Appellant, v. The SOUTH CAROLINA NATIONAL BANK OF CHARLESTON, a corporation, et al., Respondents.

(217 S. E. (2d) 135)

*Messrs. Dobson & Dobson,* of Greenville, *for Appellant,*

*Messrs. Rainey, Fant & McKay,* of Greenville, *for Respondents,*

June 26, 1975.

NESS, Justice:

This case involves the question of whether a non-competition clause in a noncontributory pension plan, where such clause is unlimited in terms of time and geographical extent, constitutes an unreasonable restraint on trade, and is thus void and unenforceable as against public policy.

Almers was an employee of the South Carolina National Bank (hereinafter SCN) of Charleston, during a seventeen-year period from 1948 until 1965. In 1965, he left the respondent's employ and took a position with Southern Bank and Trust Company (hereinafter Southern), in Greenville, South Carolina. At SCN, appellant was a vice-president, ranking fourth in chain of command. His duties with SCN could be categorized generally as administrative and internal; and substantially the same with Southern.

From 1950 to 1965 appellant had been covered under a SCN profit sharing program in which all contributions to the plan were made by the Bank and there was no individual contribution by participants. All forfeitures under any provision of the plan, including the competitive employment provision, accrue to the benefit of the remaining participants in the plan not to the Bank. The plaintiff had acquired an 85% vested interest which at oral argument was estimated to be worth Twenty Thousand ($20,000.00) Dollars. However, subsequent to Almers' departure from the employ of SCN, and his assumption of his new position with Southern, his benefits under the aforementioned profit sharing plan were terminated by SCN pursuant to the following restrictive proviso contained in the plan:

"Notwithstanding anything in this Plan to the contrary, no benefit shall be paid hereunder subsequent to the date

any Participant, former Participant or Retired Employee enters any employment in the State of South Carolina, if in the opinion of the Board such employment is in competition with or to the detriment of The South Carolina National Bank of Charleston."

The master concluded that the clause was unreasonably broad and invalid. The county judge reversed. We agree with the master.

Appellant contends that this forfeiture provision is void because it is an unreasonable restraint of trade. While the forfeiture is not a direct restraint of trade in that the appellant is not precluded from engaging in his chosen profession, appellant argues that the consequences of forfeiture enkindle a restraining influence, albeit in a subtle fashion. We do not have any precedents dealing with forfeiture of retirement income[1]; however, the appellant asserts that the result of permitting unrestricted forfeiture clauses is similar to that of covenants not to compete, the classic example of a direct restraint.

Case precedent in our own State is ample to establish the proposition that agreements not to compete, while looked upon with disfavor, critically examined, and construed against any employer, will be upheld as enforceable if such agreement is reasonable as to territorial extent of the restraint and the period for which the said restraint is to be imposed. *Eastern Business Forms, Inc. v. Kistler,* 258 S. C. 429, 189 S. E. (2d) 22 (1972) ; *Oxman v. Profitt,* 241 S. C. 28, 126 S. E. (2d) 852 (1962) ; *Oxman v. Sherman,* 239 S. C. 218, 122 S. E. (2d) 559 (1961) ; *Standard Register Co. v. Kerrigan,* 238 S. C. 54, 119 S. E. (2d) 533 (1961) ; *South Carolina Finance Corp. of Ander-*

---

[1] Respondent argues that *Barton v. Travelers Ins. Co.,* 84 S. C. 209, 66 S. E. 118 (1909) controls the disposition of this case. Barton dealt with deferred income from insurance sales being forfeited upon acceptance of competitive employment within a one year period. The time limitation alone distinguishes it from the instant appeal. Additionally, the replacement salesman hired in Barton to assume the plaintiff's duties would have to continue to service the policies. No similar obligation is present in a profit sharing arrangement.

*son v. West Side Finance Co.*, 236 S. C. 109, 113 S. E. (2d) 329 (1960); 11 S. C. L. Q. 343, n. 4. However, all previous opinions by this Court have passed upon the validity of noncompetition clauses in the context of either the sale of a business or practice and its good will, or the promise not to enter into competitive employment ancillary to the execution of a contract of employment. In those cases, the remedy sought by an alleged aggrieved former employer was injunctive and/or damages; the prohibition on the employee was inability to engage in a particular profession. Here, the consequence is not the inability to engage in competitive employment, but the forfeiture of pecuniary benefits should SCN, as was the case in the instant action, determine that an employee with accrued benefits had come within the aforenoted forfeiture clause. Respondents contend that the distinction as to result in the two classes of cases is critical. In so arguing, they are not without considerable supporting authority.

■ The leading discussion of covenants not to compete is the well reasoned opinion of Chief Justice Moss in *Standard Register Company v. Kerrigan, supra*.[2] In it Justice Moss observed that in order for a covenant not to compete to be enforceable, the covenant must be reasonable and consistent with the public interests. Inevitably the determination of reasonableness depends on the competing needs of the parties. The employer is entitled to protect himself from instant pirating of his old customers as well as the good will of his business. At the same time the prior clientele is not to be forever insulated from competition. Therefore, some time and geographic limitation must be incorporated into the covenant. Likewise, the public interest, an elusive concept, must not be offended. A determinative factor in this regard is the economic consequences

---

[2] *Standard* itself was based on Ohio law, but the general principles relied upon are consistent with the law of South Carolina. *Oxman v. Sherman, supra; Delmar Studios of the Carolinas v. Kinsey*, 233 S. C. 313, 104 S. E. (2d) 338 (1958) (interpreting North Carolina law).

suffered by the employee. The covenant is incompatible with the public interest if it is "unduly harsh and oppressive" tending "to deprive the employee the opportunity of supporting himself and his family." *Id.* 119 S. E. (2d) p. 540; see also Blake, Employee Agreements Not to Compete, 73 Harvard Law Review, 625 (1960) and a multitude of cases collected in two encyclopedia annotations, 41 A. L. R. (2d) 15; 43 A. L. R. (2d) 94.

Since the question presented is a matter of novel impression, we turn to cases from other jurisdictions which have considered whether forfeiture provisions are void as against public policy unless they contain reasonable limitations.

One line of cases has accepted the analogy between covenants not to compete and forfeiture provisions. The first case in this camp affords a striking parallel to the instant appeal. In *Van Hosen v. Bankers Trust Company,* 200 N. W. (2d) 504 (Iowa 1972), the plaintiff's career with Bankers Trust spanned thirty-three (33) years, beginning as a messenger boy and ending as a vice-president. A company sponsored retirement plan included a forfeiture clause, without any time limitation, in the event of competitive employment. Van Hosen requested a waiver which was denied and his retirement benefits were terminated when he accepted employment with another bank. The court observed that "employers, like employees, are participating in a constant struggle for survival." *Id.* p. 508. Nevertheless, the court noted that pensions have a humanitarian design both to provide economic stability and financial independence in otherwise nonproductive years. Thus, "the infinite forfeiture and termination of all pension rights instantly acquired by plaintiff through prior affiliation with defendant bank, merely by accepting employment with a competing institution, imposes an unjust and incivic penalty on plaintiff at the same time disproportionately benefiting these defendants." *Id.* p. 509. Accordingly, the forfeiture provision was not enforceable.

Another leading case is *Food Fair Stores, Inc. v. Greeley,* 264 Md. 105, 285 A. (2d) 632 (1972). Greeley had been employed for sixteen (16) years with Food Fair Stores when he decided to accept employment with a competitor. A forfeiture provision without reasonable time and geographical restrictions was found to be invalid. The court recognized the distinction between direct and indirect restraints, but did not find the difference dispositive of the question. The court stated that it matters not whether the employer is armed wih the legal sanction of an injunction or the subtle persuasion of a forfeiture clause.

Another case in which a reasonableness standard was considered a condition precedent to enforcement of a forfeiture provision is *Lavey. v. Edwards,* 264 Or. 331, 505 P. (2d) 342 (1973). The court considered the restraint, while not total, sufficient to impede employees from seeking alternative employment. Often times a job with a competitor, the court observed, even if it involved a promotion and increase in salary, would be insufficient to compensate for the forfeited benefits. This restraint was deemed contrary to the public interest and therefore unenforceable.

Other cases reaching a similar result but which rely on specific statutory authorization are *Muggill v. Reuben H. Donnelley Corporation,* 62 Cal. (2d) 239, 42 Cal. Rptr. 107, 398 P. (2d) 147 (1965); *Flammer v. Patton,* 245 So. (2d) 854 (Fla. 1971); see also 18 A. L. R. (3d) 1246 (1968). According to that annotation forfeiture provisions at the date of that article were so rare that no attempt to state general rules was warranted.

The respondent acknowledges the above cited line of cases; however, those cases are in the numerical minority and it is urged that the majority rule should be followed. Perhaps the leading case advancing the majority rule is *Rochester Corporation v. Rochester,* 450 F. (2d) 118 (4th Cir. 1971). At oral argument appellant, after several inquiries, conceded that Rochester is indistinguishable from the matter currently before the court. Judge Russell, inter-

preting Virginia law, rejected the forfeiture covenant not to compete analogy. He stated:

"The authorities, though, generally draw a clear and obvious distinction between restraints on competitive employment in employment contracts and in pension plans. The strong weight of authority holds that forfeitures for engaging in subsequent competitive employment, included in pension retirement plans, are valid, even though unrestricted in time or geography. The reasoning behind this conclusion is that the forfeiture, unlike the restraint included in the employment contract, is not a prohibition on the employee's engaging in competitive work but is merely a denial of the right to participate in the retirement plan if he does so engage." *Id.* p. 122.

Recently the North Carolina court in a brief opinion has adopted the rationale advanced in Rochester. *Hudson v. North Carolina Farm Bureau, etc.,* 23 N. C. App. 501, 209 S. E. (2d) 416 (1974).

Rochester is approvingly discussed in *Couch v. Administrative Committee Of Difco Lab, etc.,* 44 Mich. App. 44, 205 N. W. (2d) 24 (1972). Covenants were conceived as mechanisms that must be shackled with reasonable restrictions less they "might disable a former employee from earning a living at what is perhaps the only occupation for which he is qualified." *Id.* p. 26. The penalty imposed by a forfeiture was viewed as having "no such immediate and overwhelming impact." *Id.* p. 26. The Couch court upheld the unlimited forfeiture upon competitive employment provision even though "the practical effect of the forfeiture provision is to discourage a Difco employee who has built an equity under the profit sharing plan from leaving Difco and seeking other employment." *Id.* p. 26. Other cases which may be consulted for elaboration of this view include *Garner v. Girard Trust Bank,* 442 Pa. 166, 275 A. (2d) 359 (1971); *Flynn v. Murphy,* 350 Mass. 352, 215 N. E. (2d) 109 (1966); *Van Pelt v. Berefco, Inc.,* 60 Ill. App.

(2d) 415, 208 N. E. (2d) 858 (1965); *Brown Stove Works, Inc. v. Kimsey,* 119 Ga. App. 453, 167 S. E. (2d) 693 (1969).

An unarticulated but important consideration implicit in the majority line of cases is the freedom to contract. Whenever a contractual provision is determined to be voidable, it necessarily impinges upon the expectations of the parties. We have held that "[I]n the present practically unlimited field of human enterprise there is no good reason for restricting the freedom to contract . . . Interference would only be justifiable when it was demonstrable that, in some way, the public interests were endangered." *Reeves v. Sargeant,* 200 S. C. 494, 500, 21 S. E. (2d) 184, 187 (1942). The majority of cases have diagnosed the danger to the public as *de minimus* and therefore concluded that the forfeiture clause does not collide with the public interest.

Presented as we are with a distinct divergence of views from other jurisdictions, we hold that a forfeiture clause in a profit or pension plan which provides that upon employment with a competitor a participant is divested of rights under the plan is invalid unless it contains reasonable time and geographic limitations. Corbin on Contracts, § 1394, p. 94. The ultimate test of reasonableness depends on a sifting and weighing of the individual facts of each case. Standard Register Company, *supra.* Since the plan currently before the Court is without these limiting features, the forfeiture provision is unenforceable.

This holding is premised upon three basic considerations hereinafter discussed.

First, we examine the economic injury to the employee. In *Standard Register Company, supra,* a covenant not to compete was considered unenforceable if it was unduly burdensome or oppressive, tending to deprive a person of the right to support himself and his family. The consequences of the forfeiture provision without time or geographical limitations will often work such a result. Thus, while the

employee is able to currently support himself and his family, it is likely that he or others similarly situated may be bereaved when the time for retirement has come. The funds allocated for retirement, a period when he may be incapable. of otherwise supporting himself and his dependents, would have vanished, or more accurately, inured to the benefit of the remaining participants in the South Carolina National Plan. It is the function of the law to maintain a reasonable balance in cases such as this, and this requires us to recognize that there is such a thing as unfair competition by an ex-employee as well as unreasonable oppression by an employer. The circumstances of each case must be carefully scrutinized. Accordingly, we think the result of the forfeiture provision, applied generally under this plan, would erode the protection intended under the rationale of *Standard Register Company, supra.*

Second, we consider the practical affect of the *presence* of the forfeiture clause. Congress in 1974 passed a comprehensive Pension Reform Act. While it was not effective at the time of the institution of this action and thus not applicable, it is of great assistance to us. After numerous public hearings, one of the conclusions reached by Congress was that forfeitability of pension and profit sharing retirement income interfered "with the mobility of labor, to the detriment of economy." U. S. Code Cong. & Admin. News, Vol. 3, p. 4679 (1974). Accordingly, under the Act, no longer will a vested benefit be forfeitable "because the employee later went to work for a competitor or in some other way was considered 'disloyal' to the employer." *Id.* p. 4726. Congress noted that it was in the public interest to have a portable working class, unimpeded by forfeiture provisions.[3]

---

[3] The South Carolina General Assembly has already evinced a similar protection for retirement assets of participants in the South Carolina retirement system. Funds are exempt from creditors by way of "levy and sale, garnishment, attachment or any other process whatsoever and shall be unassignable except as herein specifically otherwise provided." S. C. Code of Laws 1962, § 61-288 (1974 Cum. Supp.) This preferred status for retirement benefits is a legislative recognition of the uniqueness of such assets. Likewise, favorable tax treatment in permitting sheltering of income illustrates the special place retirement income has in our society.

Congress has concluded and we think properly so that the spectre of financial prostration upon retirement due to forfeited rights effectively deters employees from accepting competitive employment.[4] This Court would be unduly formalistic if we invalidated a covenant not to compete because it was in direct restraint of trade, but approved forfeiture provisions which indirectly accomplished the same result. Even the majority rule recognizes that restraint is undoubtedly the purpose of the forfeiture provision. *Couch, supra.*[5]

Finally, as noted in *Standard Register Company, supra,* at common law employment restraints were invalid. Gradually covenants not to compete were engrafted as an exception to this rule. When properly circumscribed, they were specifically enforceable. The justification for this modification of the common law was that the employer had a protectable interest-precipitous raiding of clients, protection of goodwill, and security of trade secrets, etc.[6] The Court will enjoin the invasion of those rights. When the employers design is merely to restrain by forfeiture, it has all but conceded that the above mentioned business interests are not being invaded. In the case of a forfeiture the employer is not able to prevent the employee from competing but only to exercise leverage by divesting deferred income rights. The employer is attempting to avoid competition, not to protect legitimate business assets. The restraint must be no greater than is reasonable to protect the employer "—in some legitimate business interest—." While noncompetition clauses are not favored, they are tolerated, if reasonable, to protect some legitimate business in-

[4] Any reliance for upholding this provision based on the freedom to contract wanes when we consider the deprivation suffered by the public in the loss of services of the employee in a potentially higher position.

[5] This conclusion has been reached by the writer of a law review wherein he stated "the pension often represents security for the employee in his later years, which he cannot risk losing by competing and then testing the forfeiture clause in the Courts." Forfeiture of Pension Benefits for Violations of Covenants Not to Compete, 61 N.W.U.L. Rev. 290, 299 (1966).

[6] Another justification is the increased opportunity in our modern society. *Reeves, supra.*

terest, be it trade secrets, trade lists, confidentiality, etc. Here, the employer concedes that he has no valid commercial interest worthy of protection with a forfeiture clause. While an employer may prohibit employment by competition within a reasonable time and geographic extent for the protection of a legitimate commercial interest, he cannot lawfully prohibit employment by competition as a "legitimate commercial interest" in itself. Thus, the instant clause must fail also because there is no legitimate commercial interest of South Carolina National Bank which is protected by the clause.

From this discussion it would seem that the forfeiture provisions should always be void. Nevertheless, our discussion throughout this case illustrates that the covenant not to compete and forfeiture upon competing are but alternative approaches to accomplish the same practical result. Therefore, we would not substitute the reasoning of the pure logician for the realities of the business world and embark on a separate course of treatment for covenants not to compete and forfeiture provisions. When pruned to their quintessence, they tend to accomplish the same results and should be treated accordingly.

The decision of the learned Judge of the County Court for Greenville County is reversed, and the case remanded for determination of the amount due.

Reversed and remanded.

Moss, C. J., and LEWIS and BUSSEY, JJ., concur.

LITTLEJOHN, J., dissents.

LITTLEJOHN, Justice (dissenting):

I respecftully dissent and would affirm the order of Judge Price of the Greenville County Court. The essence of the opinion of Justice Ness is that a contract such as involved here is against the public policy of the State and should not be tolerated and enforced.

In my view there is nothing in the contract of an evil nature warranting the intervention of the judicial process of this State to declare it unlawful.

There is certainly nothing in the contract of an illegal or immoral nature, nor is the public so adversely affected that the courts should frown upon the establishment of a profit sharing plan with the provision quoted in the opinion of Justice Ness. Although the term "public policy" is difficult to define, it seems to be generally agreed that the courts should consider the interest of the employer, the employee, and the public. There is no showing in the record before this Court that the public will suffer if the plaintiff in this case is required to live up to the conditions of the contract.

There is no fast rule or definition of public policy applicable to all cases. Generally, it forbids one to do that which has a tendency to be injurious to the public welfare. What is and is not contrary to public policy is primarily a matter for the legislature to determine. From the fact that our legislature has not declared such contracts unlawful, we may infer that the contracts are not obnoxious to that branch of the government primarily charged with the duty of declaring public policy.

The courts should exercise judicial restraint and stay out of this field of legislation as relates to contracts unless the agreement is manifestly injurious to the public welfare, since it is the policy of the law to hold persons to contracts to which they are voluntary parties.

"The courts are averse to holding contracts unenforceable on the ground of public policy unless their illegality is clear and certain. Since the right of private contract is no small part of the liberty of the citizen, the usual and most important function of courts of justice is to maintain and enforce contracts rather than to enable parties thereto to escape from their obligations on the pretext of public policy, unless it clearly appears that they contravene public right or the public welfare. Rules which say that a given agree-

ment is void as being against public policy are not to be extended arbitrarily, because, 'if there is one thing which more than another public policy requires it is that men of full age and competent understanding shall have the utmost liberty of contracting, and that their contracts, when entered into freely and voluntarily, shall be enforced by courts of justice.'

"Many courts have cautioned against recklessness in condemning agreements as being in violation of public policy. Public policy, some courts have said, is a term of vague and uncertain meaning which it is the duty of the lawmaking power to define, and courts are apt to encroach upon the domain of that branch of the government if they characterize a transaction as invalid because it is contrary to public policy, unless the transaction contravenes some positive statute or some well-established rule of law. Other courts have approved the statement of an English judge that public policy is an unruly horse astride of which one may be carried into unknown paths. Considerations such as these have led to the statement that the power of the courts to declare an agreement void for being in contravention of sound public policy is a very delicate and undefined power and, like the power to declare a statute unconstitutional, should be exercised only in cases free from doubt." 17 Am. Jur. *Contracts* § 178.

With this rather limited discussion of public policy, we proceed to set forth the facts involved in this case. The plaintiff and SCN voluntarily entered into a contract of employment. Obviously, the plaintiff enjoyed many promotions such that he became high in the administrative organization of the bank. SCN voluntarily established a profit sharing plan. Although the employees made no conrtibution to the plan, after they worked under it, the same took on a contractual nature. The contract provided that if the plaintiff entered into an employment in this State which was, in the opinion of the board, in competition with SCN, no benefits would be paid. The plaintiff would now accept all of the

benefits of the plan and asks this Court to outlaw those parts of the contract which are not helpful to him in his particular situation. Under the terms of the profit sharing plan, those persons who leave the employment to compete with the bank are denied benefits and the benefits which a departing employee would have received inure to the benefit of all of the other employees. Accordingly, this not solely a dispute between SCN and the plaintiff. It is more of a contest between the plaintiff and the remaining employees of SCN. In no event can SCN retrieve for its own use and benefit the approximately $20,000.00 which the plaintiff would now drain out of the profit sharing plan. The remaining employees suffer the detriment.

It is interesting to note that other employees have heretofore left SCN to accept employment with other competing banks and have been denied benefits by the administration of which this plaintiff was an important part. The benefits which the plaintiff now seeks are enhanced by such action.

Contrary to the view of Justice Ness' opinion, I think that a clear distinction should be made between those cases which deal with agreements not to compete and agreements, like the one now before the Court, which involve forfeitures only. The reason for declaring agreements not to compete void is the desirability of permitting a person to use his talents to make a livelihood. Such is not involved here because the plaintiff has a job of his own choosing. The public is not deprived of this plaintiff's talents. In either employment he devotes his skills to his employer, which in turn, at least indirectly and at least theoretically, benefits the public.

I find no wickedness in the fact that the bank gets a benefit from the contract which established the voluntary profit sharing plan. There is nothing wrong with an employer, who has trained its employee, entering into a contract or setting up a profit sharing plan which encourages the em-

ployees to remain. An employer may agree to raise the salary of an employee a stipulated amount every year over a period of years in order to encourage them to remain. Such does not contravene public policy, although it obviously would encourage an employee not to change jobs.

Although many of the cases refer to that which the employee gives up when he leaves the employment as being a forfeiture, in my view there is no genuine forfeiture in the usual sense of the word. In order to receive the benefits provided in the plan the employee must comply with his part of the contract, and upon failing to comply he simply is not entitled to any benefits. In other words, one cannot forfeit that to which he was never entitled.

I consider the public policy issue the primary ground of appeal in this case. However, the plaintiff also contends that he should be entitled to relief because the profit sharing committee abused its discretion in determining that his employment was competitive or detrimental to SCN. The plaintiff was a vice president in charge of the installment loan department at SCN's Charleston office. He accepted employment, assuming the position of vice president and comptroller with the Southern Bank and Trust Company in Greenville, a competing bank with SCN which has branches in Greenville. The duties of the plaintiff are substantially the same, and it is clearly inferable that he is using the vast training and experience which he obtained through employment with SCN for the benefit of a competitor. The contentions of the plaintiff on this issue are clearly without merit.

I would affirm the order of the lower court.