**SCHLUMBERGER TECHNOLOGY CORPORATION,**
Plaintiff–Appellee/Cross–Appellant,

v.

**Jerry G. BLAKER,**
Defendant–Appellant/Cross–Appellee.

Nos. 88–1221, 88–1296.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 9, 1988.

Decided Oct. 6, 1988.

Fred S. White, Bamberger Foreman Oswald & Hahn, Evansville, Ind., for defendant-appellant/cross-appellee.

Brian P. Williams, Kahn Dees Donovan & Kahn, Evansville, Ind., for plaintiff-appellee/cross-appellant.

Before CUMMINGS and EASTERBROOK, Circuit Judges, and GRANT, Senior District Judge.[*]

EASTERBROOK, Circuit Judge.

Schlumberger Technology Corp. fired Jerry Blaker in February 1984, after 15 years with the firm. Since 1982 Blaker, a geologist, had been the Division Manager of the Rocky Mountain Division of the Schlumberger Well Services division. Blaker was in charge of selling Schlumberger's services in the wireline logging of oil and gas wells—a method of inferring the reserves and future productivity of wells—and supervising those who rendered the services. When he joined Schlumberger in 1969 Blaker promised not to reveal its trade secrets and also pledged that for two years after leaving he would not engage in activities "similar to or in competition with those of [Schlumberger] ... in [a] zone of 100 mile radius from a location or office where [Schlumberger] shall have, in the year preceding the date of such termination, done or is then doing such business." Because Schlumberger offers wireline logging services wherever oil wells are found, this effectively forbade Blaker to compete with Schlumberger anywhere in North America, if not the world. The contract allowed Blaker to seek a waiver, which "shall not be unreasonably withheld."

Blaker took up employment in Indiana in August 1984 as the executive vice president of BPB Instruments, Inc., a firm offering wireline logging services in the Illinois Oil Basin and Alberta, Canada. BPB and Schlumberger are competitors. Schlumberger declined to waive the restrictive covenant Blaker had signed in 1969 (it views BPB as the competitor whose wireline logging services are most like its own, and therefore thought that Blaker's knowledge was transferrable to BPB) and filed this diversity suit to enforce it. Applying Indiana law, the district court held that the no-competition clause is unreasonably broad and declined to enforce it outside the Rocky Mountain area; the court enjoined Blaker from disclosing Schlumberger's trade secrets, however. 623 F.Supp. 1310 (S.D.Ind.1985).

The two years have passed, and Blaker has left BPB's employ to take up work in a line of business that does not compete with Schlumberger. There is no current controversy about Schlumberger's entitlement to injunctive relief, and we dismiss as moot Schlumberger's appeal asking for an alteration in the terms of the injunction. The parties remain locked in controversy, however, about the consequences of a contract Blaker signed in Colorado on the last day of his employment with Schlumberger.

Schlumberger was supposed to give Blaker six months' notice of termination; since it gave him one day's notice, it would have owed him the difference between six months' pay and his earnings in other employment. Blaker believed that Schlumberger also owed him profit-sharing payments and home mortgage interest differential payments for those six months. Schlumberger offered, and Blaker accepted, an arrangement under which his full salary, plus medical and dental coverage, would be continued for six months, through September 1984. Starting on October 1, Blaker was to receive 18 monthly payments equal to half of his salary. For his part, Blaker acknowledged the validity of the 1969 contract and waived all claims arising out of the discharge. The agreement continued:

[A]ny breach by you [Blaker] of any term or condition of this letter or any contract that you may have with Schlumberger will release Schlumberger from any further liability to make the payments [specified in the agreement]....

Schlumberger paid Blaker the six months' full salary. But by October 1, when the first month's installment at half pay was due, Blaker had been working at BPB for two months. Schlumberger withheld the rest of the money. Blaker asked the district judge to order it paid, and the judge

---

[*] Hon. Robert A. Grant, of the Northern District of Indiana, sitting by designation.

refused on the ground that the payments were conditioned on Blaker's abiding by the no-competition clause.

We shall assume, as the district court held, that the 1969 no-competition agreement could not be enforced, under Indiana law, outside the states comprised by the Rocky Mountain Division that Blaker once managed. See *Licocci v. Cardinal Associates, Inc.,* 445 N.E.2d 556 (Ind.1983) (discussing the treatment of no-competition clauses in Indiana). We shall also assume that Blaker either was fired for cause or is in no position, given the 1984 agreement, to say otherwise, and that Schlumberger did not "unreasonably" withhold permission to work for BPB. Blaker does not raise either of these contentions in this tribunal.

Withholding payments due under the 1984 letter contract is a form of enforcement by self help. It induces ex-employees to go into a different line of work, even though a court will not compel them to do so. May employers deter competition by buying off would-be competitors, when they cannot enlist the judiciary to forbid competition? Alternatively put, the question is whether, in the language of the 1984 contract, competing in violation of an overbroad restrictive covenant is a "breach" of that covenant. Blaker contends it is not, on the ground that the court's refusal to enforce the contract meant that the clause was expunged, and one cannot break a promise that does not exist.

Before we address the merits, we must know which state supplies the applicable law. The parties and the district court must have assumed that the source is Indiana—and on that ground failed to discuss the point—but this is not plain. The 1969 contract says that "this Agreement will be interpreted and construed in accordance with the laws of that jurisdiction in which enforcement is sought", which is Indiana, but the problem we now confront concerns the meaning and validity of the 1984 contract. That agreement was signed in Colorado, where Blaker then lived and worked. Schlumberger's principal offices are in Texas, and Schlumberger's performance under the 1984 contract would occur

there. Competition could occur anywhere in the world. So perhaps Texas or Colorado law applies under the choice-of-law rules of Indiana, which govern in this diversity litigation because the federal court sits there. Cf. *Sarnoff v. American Home Products Corp.,* 798 F.2d 1075, 1080–82 (7th Cir.1986) (under Illinois choice of law rules, the law of the employer's home state applies to a similar problem, at least when the contract specifies this). The parties' silence waives any challenge to the district court's use of Indiana law, however, and we will not fasten on the parties a rule of law neither has requested. *Muslin v. Frelinghuysen Livestock Managers, Inc.,* 777 F.2d 1230, 1231 n. 1 (7th Cir.1985); *Casio, Inc. v. S.M. & R., Inc.,* 755 F.2d 528, 530–31 (7th Cir.1985).

■ Consider first Blaker's argument that to hold the clause unenforceable by specific performance is to take a blue pencil to the contract, so that there was no outstanding promise; no promise, no breach of promise; no breach of the 1969 contract, no problem under the 1984 contract. This is not logically necessary. Save in unusual cases, courts decline to order specific performance and leave the parties to damages. To hold a contract unenforceable by injunction is not to hold its provisions useless for all purposes. Blaker insists, though, that the restrictive covenant was not only unenforceable but also invalid and fell within this provision of the 1969 contract:

> Should any portion of this Agreement be judicially held to be invalid, unenforceable or void, such holding shall not have the effect of invalidating or voiding the remainder of this Agreement not so declared or any part thereof, the parties hereby agreeing that the portion so held to be invalid, unenforceable, or void shall, if possible, be deemed amended or reduced in scope, otherwise to be stricken therefrom, only to the extent required for purposes of validity and enforcement in the jurisdiction of such holding.

There, says Blaker, is a blue-pencil clause in black and white. The restrictive covenant was held invalid; therefore it van-

ished; therefore it was not around to be breached; therefore he lived up to his promises in the 1984 agreement and is entitled to the money. Indiana cases sometimes treat clauses held invalid as if written in disappearing ink, reinforcing the argument. E.g., *Seach v. Richards, Dieterle & Co.*, 439 N.E.2d 208, 214–15 (Ind.App. 1982). Such cases treat the offending clause as gone, though, only for the purpose of saving what is left; they do not hold that an unenforceable clause drops into another dimension for every purpose.

The 1969 contract calls for the invalid provision to be struck out "only to the extent required". An employer may fear that it will lose in Indiana (or a state with similar restrictions on no-competition clauses) but hope to obtain enforcement in, say, Alberta, which may permit them. Blaker could not procure the right to compete everywhere in the world just by locating in a state with favorable law; each jurisdiction may decide for itself the effectiveness of such clauses within its territory. If the clause were to be enforceable in some though not all jurisdictions—as the 1969 agreement surely contemplated—it would have to survive redaction in the first jurisdiction to consider it. The contract says that the unenforceable clause does not vanish unless absolutely necessary. Disappearance might be unnecessary for either of two reasons: the clause was enforceable in another jurisdiction, or the clause defined monetary obligations and so had life even though it could not be enforced by specific performance. Putting the argument this way shows that arguments about invisible ink and the like—metaphysical at best—are here circular. To determine whether the clause was ripped out of the 1969 contract in 1985, when the district court withheld specific performance, or instead became dormant until a dispute about money arose, we need to know whether Indiana enforces forfeiture clauses of the sort contained in the 1984 contract.

Unfortunately, the parties have not enlightened us on this question. If a state's reason for declining to enforce restrictive covenants is that, given the termination of the initial employment, such clauses deprive the public of the benefit of competition, then it might decline to enforce a financial penalty for going into competition with the former employer. Specific relief by injunction, and self help under a forfeiture clause, tend to reduce competition. Neither does so entirely. An employer entitled to an injunction may forego its rights if the ex-employee is willing to compensate the employer for suffering competition. That is to say, the former employee may buy back his right to compete, even if an injunction is readily available. A clause requiring the ex-employee to forfeit benefits in the event of competition is effectively a price agreed on in advance for the right to compete.

States that restrict the scope of no-competition clauses do not necessarily take this view of affairs, however. They may limit the scope and duration of such clauses because they believe that, by barring employees from given lines of business after separation, these clauses discourage employees from improving their knowledge and skills. The more specialized their skills, the more they will be harmed by the enforcement of the restrictive covenant in the event of separation. Or these states may believe that enforcement of the no-competition clause unduly reduces the employee's earning opportunities after separation, injuring members of the family who were not responsible for the arrangement (and potentially leaving the ex-employee a public charge). See *Mitchel v. Reynolds*, 1 P.Wms. 181, 24 Eng.Rep. 347 (K.B.1711). States holding these views would not object to the enforcement of contracts by which the firm pays the ex-employee not to compete. The employee then may put his skills to the highest use (and forego the extra compensation) or accept the payment (making up for the lower income until the restrictive covenant expires).

A state also could believe that no-competition clauses are beneficial because they lead firms to invest more in training their employees and so make competition more keen (and production more efficient) today even though they may remove sources of competition tomorrow; such states would

enforce forfeiture clauses that contributed to training and competition ex ante—but we disregard this possibility because we are assuming that Indiana would not enforce the restrictive covenant in the 1969 contract.

Many states have chosen sides on the question whether a contract calling for the forfeiture of benefits—severance pay, stock options, bonuses, pensions, and the like—in the event of competition will be enforced even if the underlying restrictive covenant will not support an injunction. The majority of states enforce such forfeiture clauses. See Annotation, 18 A.L.R.3d 1240 (1968 & Supp.1988). Perhaps the leading "enforcement" jurisdiction is New York, whose law we considered and applied in *Sarnoff* to a contract calling for the forfeiture of stock options awarded as bonuses. The most recent of the New York cases, *Post v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 48 N.Y.2d 84, 421 N.Y. S.2d 847, 397 N.E.2d 358 (1979), made it clear that New York's disinclination to enforce restrictive covenants depended on its abhorrence of contracts "sanctioning the loss of a man's livelihood" (421 N.Y.S.2d at 848, 397 N.E.2d at 359). Forfeiture contracts leave the ex-employee free to make a living as he chooses. The former employee accepts the money (and refrains from competition) only when the total income from the package plus non-competitive employment exceeds the income he could earn from competitive employment. Having such a choice does not threaten "loss of livelihood", so New York and the majority of other states that have considered the question enforce these agreements. See also, e.g., *Couch v. Administrative Committee of Difco Laboratories, Inc. Salaried Employees Profit Sharing Trust*, 44 Mich.App. 44, 205 N.W.2d 24 (1972); *Van-Pelt v. Berefco, Inc.*, 60 Ill.App.2d 415, 208 N.E.2d 858 (1st Dist.1965) (applying Massachusetts law); *Miller v. Associated Pension Trusts, Inc.*, 396 F.Supp. 907 (E.D.Mo. 1975) (New Jersey law). Cf. *Henn v. National Geographic Society*, 819 F.2d 824, 828–29 (7th Cir.1987) (offering a senior employee a retirement benefit package is not age discrimination, because the offer makes the employee better off). New York will not enforce the forefeiture clause when the employee is fired without cause, but as Blaker has not argued to the district court or us that his discharge was unjustified, this exception to the majority rule does not apply.

California is the leading jurisdiction on the other side, treating almost all restrictive agreements, including many trade secret agreements, as interfering with the public's interest in obtaining the benefits of competition. Restrictive clauses are "void" under a state statute. California therefore declines to enforce both the no-competition clauses and any side agreements that induce ex-employees to observe their terms. See *Muggill v. Reuben H. Donnelley Corp.*, 62 Cal.2d 239, 42 Cal.Rptr. 107, 398 P.2d 147 (1965). For similar cases, also relying on state statutes, see *Van Hosen v. Bankers Trust Co.*, 200 N.W.2d 504 (Iowa 1972); *Graham v. Hudgins, Thompson, Ball & Associates, Inc.*, 540 P.2d 1161 (Okla.1975). Cf. *Pollard v. Autotote, Ltd.*, 852 F.2d 67 (3d Cir.1988) (predicting that Delaware would decline to enforce forfeiture clauses when it would not grant specific performance).

Indiana has no statute similar to California's. The courts of Indiana have not cited the cases in the two competing lines of decision. And Indiana's cases do not clearly choose among the reasons for disfavoring restrictive covenants. They contain language such as:

> All such covenants as this are in restraint of trade and are not favored by the law. They will be enforced only if they are reasonable with respect to the covenantee, the covenantor and the public interest. We make this determination upon the basis of the facts and circumstances surrounding each case. It depends upon a consideration of the legitimate interests of the covenantee which might be protected, and the protection granted by the covenant, in terms of time, space, and the types of conduct or activity prohibited.

*Licocci*, 445 N.E.2d at 561 (citation omitted). This does not assist us in deciding

whether Indiana would follow New York or California.

■ Any prediction about how a state would decide a question that is wide open in the jurisdiction is dangerous. We think it likely, however, that Indiana would follow New York. This is not only because New York's is the majority view—though that is important—but also because Indiana has never demonstrated the profound hostility to restrictive covenants that informs California's jurisprudence. If Indiana law depends on balancing multiple interests, it would be important that (a) a forfeiture clause does not deprive the public of the benefits of competition when, as in this case, the ex-employee goes into competition despite the clause; (b) an offer of benefits contingent on curtailing competition does not impoverish the ex-employee, who will take the offer only when the combination of income from non-competitive employment and the value of the offer exceeds the income available from competitive work. An offer like the one made to Blaker—sometimes called "golden handcuffs"—is not a plausible way to monopolize an industry. A firm such as Schlumberger has thousands of employees. If Schlumberger has monopolized the wireline logging business, at least some of these employees will find it worthwhile to spurn the 18 months of half pay and go into competition, causing the erosion of market power. A judicially-enforced no-competition clause, by contrast, holds out much greater prospect of retarding new entry, because the monopolist will refuse to waive the clause, and no one can even begin to compete for two years after quitting; and the need to accept lower income while waiting for the clause to expire will dissuade talented people from leaving. Because an offer of benefits contingent on not competing holds less threat to the employee and the competitive process than does judicial enforcement of a no-competition clause, we think that Indiana would have enforced the terms of the 1984 contract had this suit been filed in state court. Schlumberger therefore need not make the 18 payments described in the 1984 contract.

Schlumberger's appeal, No. 88–1296, is dismissed as moot. On Blaker's appeal, No. 88–1221, the judgment is

AFFIRMED.