In the

# United States Court of Appeals
## For the Seventh Circuit

———————————

No. 23-2330

LKQ CORPORATION,

*Plaintiff/Counter-Defendant-Appellant,*

*v.*

ROBERT RUTLEDGE,

*Defendant/Counter-Claimant-Appellee.*

———————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:21-cv-03022 — **Thomas M. Durkin**, *Judge.*

———————————

ARGUED FEBRUARY 14, 2024 — DECIDED MARCH 15, 2024

———————————

Before SCUDDER, ST. EVE, and LEE, *Circuit Judges.*

SCUDDER, *Circuit Judge.* This case presents a complicated and important issue of Delaware law: whether, and in what circumstances, contractual provisions requiring a corporation's former employees to forfeit a monetary benefit upon leaving the firm and joining a competitor—so-called forfeiture-for-competition provisions—are subject to review for reasonableness. Robert Rutledge agreed to such a provision as part of his participation in LKQ Corporation's restricted

stock program. When he resigned from the company and went to work for a competitor, LKQ sought to recover from Rutledge the proceeds he realized from multiple stock sales over many years.

Earlier this year the Delaware Supreme Court held in *Cantor Fitzgerald, L.P. v. Ainslie*, No. 162, 2023, 2024 WL 315193 (Del. Jan. 29, 2024) that forfeiture-for-competition provisions in limited partnership agreements are not subject to a reasonableness review. What we cannot discern with confidence is whether the holding in *Cantor Fitzgerald* applies outside the context of highly sophisticated parties, including where the mandated forfeiture is expansive in scope. Because of the importance of stability and predictability in Delaware corporate law and the common use of restrictive stock unit agreements governed by Delaware law, we certify the questions set forth in this opinion to the Delaware Supreme Court. We otherwise affirm the district court's entry of judgment in Rutledge's favor.

## I

### A

For more than a decade, Robert Rutledge worked as a Plant Manager at LKQ Corporation, a national supplier of salvage and recycled automobile parts. Rutledge oversaw the company's Lake City, Florida facility. LKQ designated Rutledge as a "key person" eligible to receive restricted stock unit awards—a designation reserved for less than two percent of its workforce. Key persons can decline stock awards without consequence. LKQ conditions them solely on the recipient employee executing and abiding by a Restricted Stock Unit (RSU) Agreement. Employees must also separately execute

Confidentiality, Non-Competition, and Non-Solicitation Agreements, which the parties collectively call Restrictive Covenant Agreements.

Each year between 2013 and 2020, LKQ offered Rutledge a restricted stock unit award. In connection with accepting those awards, he executed RSU Agreements with LKQ. From 2011 to 2020, Rutledge also entered into separate Restrictive Covenant Agreements. In return, Rutledge received an annual allotment of LKQ stock distributed on a vesting schedule. He later sold all of his vested stock—the value of which the parties dispute but is in the hundreds of thousands of dollars—on the open market.

Among other terms, the RSU and Restrictive Covenant Agreements prohibited Rutledge from working for a competitor within nine months of leaving LKQ. Breach risked injunctive relief, or in the case of the RSU Agreements, forfeiting all proceeds from the stock awards. In April 2021, five days after resigning from LKQ, Rutledge went to work for Fenix Parts, LKQ's direct competitor.

B

Invoking diversity jurisdiction, LKQ sued Rutledge in federal court in Chicago, alleging breach of the RSU Agreements, breach of the Restrictive Covenant Agreements, and unjust enrichment. LKQ sought injunctive relief under the Restrictive Covenant Agreements and the claw back of all proceeds realized from each of Rutledge's sales of stock.

The district court made short work of LKQ's unjust enrichment claim. It explained that a claim for unjust enrichment—even pleaded in the alternative—is unavailable under Illinois law where the claim's challenged conduct is the subject of an

express contract. Since LKQ pleaded that the RSU Agreements governed the parties' relationship, incorporating those allegations in its unjust enrichment claim, it could not also seek recovery from Rutledge on a theory of unjust enrichment.

Following discovery, the parties filed cross motions for summary judgment, focusing on the enforceability of both the RSU and Restrictive Covenant Agreements. The district court devoted the bulk of its attention to the forfeiture-for-competition provision in each RSU Agreement. Relying on the Delaware Chancery Court's opinion in *Ainslie v. Cantor Fitzgerald, L.P.*, No. 9436, 2023 WL 106924 (Del. Ch. Jan. 4, 2023), the district court concluded that Delaware law requires analyzing a forfeiture-for-competition provision for reasonableness. From there, the district court determined that the RSU Agreements (under Delaware law) and Restrictive Covenant Agreements (under Illinois law) imposed unreasonable restraints on trade, rendering both unenforceable. In the end, then, the district court entered judgment for Rutledge on LKQ's claims.

LKQ now appeals, challenging both the district court's dismissal of the unjust enrichment claim and entry of summary judgment for Rutledge.

## II

While the most substantial issue on appeal concerns the forfeiture-for-competition provision within the RSU Agreements, we can resolve the other issues without much difficulty. We start with the district court's dismissal of LKQ's claim for unjust enrichment. We review the dismissal against a clean slate, construing all facts and reasonable inferences in LKQ's favor. See *Gociman v. Loyola Univ. of Chi.*, 41 F.4th 873,

881 (7th Cir. 2022). The parties agree that Illinois law governs this claim. See *McCoy v. Iberdrola Renewables, Inc.*, 760 F.3d 674, 684 (7th Cir. 2014).

LKQ's unjust enrichment claim fails because it roots itself in the contention that Rutledge breached an express contract—the RSU Agreements. As we have long recognized, "[w]hen two parties' relationship is governed by contract, they may not bring a claim of unjust enrichment unless the claim falls outside the contract." *Util. Audit, Inc. v. Horace Mann Serv. Corp.*, 383 F.3d 683, 688–89 (7th Cir. 2004) (applying Illinois law). Indeed, where, as here, "the existence of a contract between the parties is undisputed, an unjust enrichment claim will seldom survive a motion to dismiss." *Gociman*, 41 F.4th at 887; see also *Karimi v. 410 N. Wabash Venture, LLC*, 952 N.E.2d 1278, 1284–85 (Ill. App. Ct. 2011) ("If the complaint expressly alleges a contract, the count alleging unjust enrichment is properly dismissed.").

LKQ does not suggest that its claim falls outside the RSU Agreements. To the contrary, it maintains that it properly and sufficiently pleaded unjust enrichment as an alternative theory of recovery. But "a party may not incorporate by reference allegations of the existence of a contract between the parties in the unjust enrichment count." *Gociman*, 41 F.4th at 887. LKQ did just that: it incorporated its allegations about the forfeiture-for-competition provision, including Rutledge's alleged "conduct … in breach of the RSU Agreements" in its claim for unjust enrichment. "[T]his pleading error prevents [any] unjust enrichment claim from going forward." *Id.*

## III

### A

We turn next to the claim that Rutledge breached the Restrictive Covenant Agreements by immediately going to work for a competitor, Fenix, upon resigning from LKQ.

Each Restrictive Covenant Agreement prohibited Rutledge from "directly or indirectly" "be[ing] employed by … any business that would be competitive with any business conducted by [LKQ] … anywhere within a 75 mile radius of any [LKQ] facility … at which [Rutledge] worked" for nine months following the termination of his employment. For Rutledge, this restriction applied to a 75-mile radius of LKQ's Lake City, Florida facility.

The parties agree that the agreements' non-competition provision is reviewed for reasonableness. Pursuant to the Restrictive Covenant Agreements' choice-of-law provision, we conduct that review under Illinois law. "[B]ecause Illinois courts abhor restraints on trade, restrictive covenants are carefully scrutinized." *Liautaud v. Liautaud*, 221 F.3d 981, 986 (7th Cir. 2000) (quoting *Prairie Eye Ctr., Ltd. v. Butler*, 713 N.E.2d 610, 613 (Ill. App. Ct. 1999)). But "it is equally established that a restrictive covenant will be upheld if it contains a reasonable restraint and the agreement is supported by consideration." *Reliable Fire Equip. Co. v. Arredondo*, 965 N.E.2d 393, 396 (Ill. 2011).

The Illinois Supreme Court has explained that a restrictive covenant is reasonable "only if the covenant: (1) is no greater than is required for the protection of a legitimate business interest of the employer-promisee[,] (2) does not impose undue hardship on the employee-promisor, and (3) is not injurious

to the public." *Id.* Baked into this totality-of-the-circumstances review is "the propriety of the limitations in terms of their length in time, their territorial scope, and the activities that they restrict." *Cambridge Eng'g, Inc. v. Mercury Partners 90 BI, Inc.*, 879 N.E.2d 512, 522 (Ill. App. Ct. 2007); see also *Reliable Fire*, 965 N.E.2d at 396, 403.

B

Like the district court, we see the non-competition provision as overbroad and unreasonable. Most troublesome is the nine-month restriction barring Rutledge from working for any competitor in any capacity. Illinois law disfavors "blanket bar[s] on all activities for competitors." *Cambridge Eng'g*, 879 N.E.2d at 526; see also *AssuredPartners, Inc. v. Schmitt*, 44 N.E.3d 463, 443 (Ill. App. Ct. 2015) (holding a restrictive covenant prohibiting work "in any capacity" within professional liability insurance overbroad and unenforceable); *Bus. Recs. Corp. v. Lueth*, 981 F.2d 957, 962 (7th Cir. 1992) (recognizing that Illinois courts "frown upon an across-the-board limitation on [an employee's] right to ply his trade"). "Restrictions on activities," the Illinois courts have explained, "should be narrowly tailored to protect only against activities that threaten the employer's interest." *Cambridge Eng'g*, 879 N.E.2d at 526 (citation and internal quotation marks omitted). An employment bar is especially problematic where, as here, it forecloses work within an entire industry or market segment. See *id.* Put another way, Rutledge could switch occupations, working for Fenix in a noncompetitive capacity without harm to LKQ's interests, and still violate the provision. We have little difficulty concluding that "[s]uch blatant overbreadth goes far beyond the standard for acceptable activity restrictions." *Id.*

But that is not our only concern. The agreements' geo-graphic restriction—extending to a 75-mile radius from the Lake City facility—also gives us pause. When it comes to ge-ographic limitations within covenants not to compete, "courts generally look to whether the restricted area is coextensive with the area in which the employer is doing business." *Lawrence & Allen, Inc. v. Cambridge Hum. Res. Grp., Inc.*, 685 N.E.2d 434, 442 (Ill. App. Ct. 1997). Large radiuses might be justified by evidence that the entire area aligns with the employer's competitive market. See, *e.g.*, *Midwest Television, Inc. v. Oloffson*, 699 N.E.2d 230, 235 (Ill. App. Ct. 1998) (holding a 100-mile non-competition provision reasonable where radio sta-tion presented evidence that it had a sixty-to-ninety-mile broadcast range); *Shorr Paper Prods, Inc. v. Frary*, 392 N.E.2d 1148, 1155 (Ill. App. Ct. 1979) (highlighting evidence that 90% of the employer's customers were located within a 100-mile geographic restriction supported non-compete's reasonable-ness). While LKQ insists that the Lake City facility's market is coextensive with the provision's 75-mile radius, the assertion comes without evidentiary support.

By any measure, a 75-mile radius is large. It covers a large swath of the upper third of Florida and extends into Georgia. Rutledge could not work outside of that range without under-taking a commute (each way) of over an hour. Remember, too, that LKQ believes Rutledge breached the provision not by working at a nearby Fenix facility, but instead by working out of his Lake City, Florida home for facilities in Texas, New Jer-sey, Pennsylvania, Massachusetts, North Carolina, and other locations within Florida—all hundreds of miles from his home office.

Given the totality of these circumstances, we have little trouble concluding that the Restrictive Covenant Agreements' non-competition provision is unreasonable. Perhaps anticipating this outcome, LKQ asks us to "blue pencil" the provision to comport with the law. We decline the invitation. Illinois courts "refuse to modify an unreasonable restrictive covenant … where the *degree* of unreasonableness renders it unfair." *Eichmann v. Nat'l Hosp. & Health Care Servs., Inc.*, 719 N.E.2d 1141, 1149 (Ill. App. Ct. 1999). The district court heeded this instruction, and so do we, especially where the overbreadth of the employment restrictions would result in substantial modification of the terms of the Restrictive Covenant Agreement.

We can stop there. Since the provision is unreasonable and unenforceable, we need not consider Rutledge's contentions that the Restrictive Covenant Agreements lacked consideration in the first instance and more generally do not protect legitimate business interests. The district court was right to enter summary judgment for Rutledge on his claim challenging the Restrictive Covenant Agreements.

## IV

That brings us to the most difficult aspect of this appeal—the forfeiture provision within the Restricted Stock Unit Agreements. The parties agree that Delaware law governs. Two weeks before oral argument, the Delaware Supreme Court reversed the prior Chancery Court decision in *Cantor Fitzgerald* and held that forfeiture-for-competition provisions in limited partnership agreements are not subject to review for reasonableness. See *Cantor Fitzgerald*, 2024 WL 315193, at *13. *Cantor Fitzgerald* provides a new framework, one not

available to the district court but which controls our review of Rutledge's challenge to the RSU Agreements.

## A

A forfeiture-for-competition provision operates differently than a traditional restrictive covenant. The latter prohibits an employee from competing with their former employer. If breached, the employer can seek injunctive relief to enforce the employment restriction. But a forfeiture-for-competition provision imposes a different consequence if a former employee competes. Instead of prohibiting the competition outright, a forfeiture provision, as its name implies, works to forfeit or claw back a contingent benefit, thereby imposing a financial burden on the former employee. See *Deming v. Nationwide Mut. Ins.*, 905 A.2d 623, 634 (Conn. 2006).

Two views have emerged on how to treat these provisions. See 15 Corbin on Contracts § 80.25 (2023); 6 Williston on Contracts § 13:13 (4th ed. 2023). Some jurisdictions conclude that, regardless of form, forfeiture provisions function as restraints on trade and should be reviewed for reasonableness like restrictive covenants. See, *e.g.*, *Allegis Grp., Inc. v. Jordan*, 951 F.3d 203, 210 (4th Cir. 2020) (Maryland law); *Deming*, 905 A.2d at 638; *Brockley v. Lozier Corp.*, 488 N.W.2d 556, 563 (Neb. 1992); *Cheney v. Automatic Sprinkler Corp. of Am.*, 385 N.E.2d 961, 965 (Mass. 1979); *Harris v. Bolin*, 247 N.W.2d 600, 602 (Minn. 1976); *Almers v. S.C. Nat'l Bank of Charleston*, 217 S.E.2d 135, 138–39 (S.C. 1975). They reason that these provisions, like restrictive covenants, operate to deter competition, something that public policy disfavors. *Deming*, 905 A.2d at 637–38.

Other jurisdictions are more inclined to embrace an "employee choice" doctrine, which enforces some forfeiture-for-

competition provisions under more traditional principles of contract law without inquiry into their reasonableness. See, *e.g.*, *Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 254 (2d Cir. 2002) (New York law); *Rochester Corp. v. Rochester*, 450 F.2d 118, 123–24 (4th Cir. 1971) (Virginia law); *Schlumberger Tech. Corp. v. Blaker*, 859 F.2d 512, 517 (7th Cir. 1988) (Indiana law); *Trumble v. Farm Bureau Mut. Ins. Co. of Idaho*, 456 P.3d 201, 212 (Idaho 2019) (declining to apply reasonableness analysis in the context of a non-employment contract); *Swift v. Shop Rite Food Stores, Inc.*, 489 P.2d 881, 883 (N.M. 1971); *Van Pelt v. Berefco*, 208 N.E.2d 858, 865 (Ill. 1965) (Massachusetts law). This view, long considered the majority approach, *Cheney*, 385 N.E.2d at 964, emphasizes that forfeiture provisions "leave the ex-employee free to make a living as he chooses." *Schlumberger*, 859 F.2d at 516. Applying freedom of contract principles, these courts explain that the affected employee calculated the cost of choosing to join a competitor and, as a result, should be held to that choice. See *id.*; *Lucente*, 310 F.3d at 254.

The Delaware Supreme Court recently grappled with these competing views in *Cantor Fitzgerald*, 2024 WL 315193. The dispute there arose in circumstances different than those here, and the question before us is whether those differences matter.

Cantor Fitzgerald is a global financial services firm that operates under a limited partnership agreement. See *id.* at *2. "[T]wo inter-related mechanisms" in Cantor Fitzgerald's limited partnership agreement—one a restrictive covenant and the second a forfeiture-for-competition provision—"discourage former partners from competing." *Id.* When six partners voluntarily left Cantor Fitzgerald and joined a competitor firm, they called the enforceability of both mechanisms into

question. They did so when seeking to enforce Cantor Fitzgerald's obligation to pay distributions of their capital accounts—capital contributions and profit share—covering a four-year period. See *id.* at *2–4.

Under the forfeiture-for-competition provision, a partner who "directly competes with the business of the partnership" forfeits unpaid capital account distributions. *Id.* at *3–4. "So, for example, a partner who refrain[ed] from [c]ompetitive [a]ctivity for two years w[ould] receive distributions during that period, but, upon commencement of competition in the third year forfeits distributions thereafter through the fourth year." *Id.* at *4. The forfeiture provision operated "regardless of the reason a partner cease[d] to be a partner." *Id.* at *3. The other mechanism, a restrictive covenant, prohibited the same competitive activity for two years and entitled Cantor Fitzgerald to withhold distributions and seek injunctive relief. *Id.* at *2–3.

Cantor Fitzgerald invoked both mechanisms to withhold capital account payments—ranging in value from just under $100,000 to over $5 million—for the six former partners who went to work for a competitor. See *id.* at *4–5. The former partners sued, contending that the mechanisms were unenforceable restraints on trade. *Id.* at *5. They prevailed on this rationale in Delaware Chancery Court.

On appeal, the Delaware Supreme Court focused review on the enforceability of the forfeiture-for-competition provision. Concluding that the provision was not a restraint on trade, it held that "[w]hen sophisticated parties agree in a limited partnership agreement that a partner, who voluntarily withdraws from, and then competes with, the partnership, will forfeit contingent post-withdrawal financial benefits,

public-policy considerations weigh in favor of enforcing that agreement." *Id.* at *13.

The court rejected the Chancery's view of the forfeiture provision as analogous to liquidated damages and emphasized the context underpinning the dispute, including that the Delaware Revised Uniform Limited Partnership Act contains an explicit directive "to give maximum effect to the principle of freedom of contract." *Id.* at *10 (quoting 6 Del. C. § 17-1101(c)). The court also saw as "significant" the "distinction between a restrictive non-competition covenant that precludes a former employee from earning a living in his chosen field and an agreement that allows a former partner to compete but at the cost of relinquishing a contingent benefit"—a difference that weakened any interest in reviewing forfeiture provisions for reasonableness. *Id.* at *13.

B

*Cantor Fitzgerald* lends itself to two interpretations—one broad and another narrow. On one hand, the Delaware Supreme Court was characteristically careful. It grounded its holding in the facts before it, emphasizing the sophistication of the parties, type of agreement, and forfeiture of unpaid contingent benefits. *Id.* at *13. The court also underscored the freedom of contract policy considerations expressed by the Limited Partnership Act, which diverge from "the common law's disfavor of forfeitures." *Id.* In doing so, the Delaware Supreme Court acknowledged the possibility that "a public-policy interest or inequitable outcome could, under some circumstances, outweigh the interest in freedom of contract enshrined in [the Limited Partnership Act.]" *Id.*

But other portions of the Delaware Supreme Court's opinion suggest a broader application. The court distinguished generally between restrictive covenants and forfeiture-for-competition provisions, observing that "[t]he policy interest that preponderates in [restrictive covenants] is diminished—if it does not vanish—in [forfeiture-for-competition provisions]." *Id.* It also emphasized that "[t]he courts of [Delaware] hold freedom of contract in high—some might say, reverential—regard." *Id.* at \*1. And when discussing how jurisdictions approach forfeiture provisions, the Delaware Supreme Court disagreed with the Third Circuit's prediction in *Pollard v. Autotote, Ltd.*, 852 F.2d 67 (3d Cir. 1988), *amended by* 872 F.2d 1131 (3d Cir. 1988), that Delaware would review a forfeiture provision in a general manager's deferred compensation incentive plan for reasonableness. *Cantor Fitzgerald*, 2024 WL 315193, at \*11 n.102. These parts of the Delaware Supreme Court's reasoning support a broader reading of *Cantor Fitzgerald*.

Even if a broad reading is the better reading, we see meaningful differences between this case and *Cantor Fitzgerald* that the Delaware Supreme Court may view as important. Perhaps foremost, the strong policy considerations raised by the Limited Partnership Act are not present here. Rutledge did not agree to the forfeiture provision in a partnership agreement or other specialized contract. Rather, he signed an ordinary corporate contract as part of LKQ's restricted stock program. Nor was Rutledge a partner or company executive represented by counsel. He worked his entire career at LKQ as a middle manager. The facts make it hard to see how the Limited Partnership Act's directive to give maximum effect to freedom of contract applies here.

The consequences of a breach also differ. In *Cantor Fitzgerald*, the breach excused the company from paying contingent distributions of a limited partner's earned capital. Here, however, Rutledge's alleged breach would forfeit the grant of stock or any proceeds from the sale of those shares. LKQ's RSU Agreements contain no limit on how far back the forfeiture applied, notwithstanding how much time had passed since Rutledge executed each agreement. In application, that would allow LKQ to claw back stock proceeds long vested and sold. Indeed, LKQ seeks to clawback eight years of stock award proceeds, worth hundreds of thousands of dollars (at least $600,000), from a middle manager making a modest salary (about $109,000).

Finally, a subset of the RSU Agreements also entitled LKQ to seek injunctive relief. Although LKQ never acted on this right, a hallmark of forfeiture provisions is that they are not enforceable through injunctive relief. *Id.* at *13. This, too, differs from the circumstance before the Delaware Supreme Court in *Cantor Fitzgerald*.

### C

As a federal court sitting in diversity, our obligation is to "predict how the state's highest court would answer the question presented." *Cage v. Harper*, 42 F.4th 734, 739 (7th Cir. 2022). But here we are unable to predict with confidence how broadly Delaware courts would apply *Cantor Fitzgerald*, leaving us to conclude that the most prudent course is to invite the opinion of the only body that can definitively construe Delaware law—the Delaware Supreme Court.

Jurisdictions remain divided on how to treat forfeiture provisions, and the Delaware Supreme Court has only

recently weighed in. See *Cantor Fitzgerald*, 2024 WL 315193, at
*1; *Deming*, 905 A.2d at 634–35 (collecting cases); Annot. 81
A.L.R.2d 1066 (1962); Annot. 18 A.L.R.3d 1246 (1968). While
*Cantor Fitzgerald* considered the public policy considerations
in a limited partnership agreement, forfeiture provisions ap-
pear in a host of other contracts connected to stock, deferred
compensation, and other incentive programs. The enforcea-
bility of those provisions, and whether reasonableness review
applies, likely has far reaching impacts on corporations and
their employees. Given the importance of stability, predicta-
bility, and uniformity in Delaware corporate law, see *Stream
TV Networks, Inc. v. SeeCubic, Inc.*, 279 A.3d 323, 353–54 (Del.
2022), we see the Delaware Supreme Court as best suited to
provide guidance on how best to read *Cantor Fitzgerald*.

Delaware law allows the certification of state law ques-
tions by federal courts of appeals directly to the Delaware Su-
preme Court, Del. Sup. Ct. R. 41(a)(ii), so we respectfully cer-
tify the following questions:

> (1) Whether *Cantor Fitzgerald* precludes review-
> ing forfeiture-for-competition provisions for
> reasonableness in circumstances outside the
> limited partnership context?

> (2) If *Cantor Fitzgerald* does not apply in all other
> circumstances, what factors inform its appli-
> cation? For example, does it matter what
> type of agreement the forfeiture provision
> appears in, how sophisticated the parties
> are, whether the parties retained counsel to
> review the provision, whether the forfeiture
> involves a contingent payment or claw back,
> how far backward a claw back reaches,

whether the employee quit or was involuntarily terminated, or whether the provision also entitled the company to injunctive relief?

We do not intend this formulation to limit the Delaware Supreme Court's considerations, and we invite the court to refine these questions as it deems appropriate.

In certifying these questions, we also recognize that the case will return to us for applying any legal guidance the Delaware Supreme Court chooses to provide to us and all other courts sure to grapple with how best to read *Cantor Fitzgerald*.

## V

For these reasons, we certify these questions to the Delaware Supreme Court. We otherwise affirm the district court's entry of judgment for Rutledge on the breach of the Restrictive Covenant Agreements and unjust enrichment claims.

QUESTIONS CERTIFIED.